John D. HAYES, Stacy R. Hayes, and Old National Bancorp, Appellants–Defendants,

v.

Robert Lee CHAPMAN, Jr., Appellee–Plaintiff.

No. 53A05–0802–CV–84.

Court of Appeals of Indiana.

Oct. 16, 2008.

---

John R. McKay, Hickam & Lorenz, P.C., Spencer, IN, Attorney for Appellants John and Stacy Hayes.

Karen A. Wyle, Bloomington, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Appellants-defendants John D. Hayes and Stacy R. Hayes appeal the trial court's

order denying their counterclaim against appellee-plaintiff Robert Lee Chapman, Jr., and foreclosing Chapman's mechanic's lien on construction he performed on the Hayeses' residence. The Hayeses argue that the trial court erroneously concluded that Chapman did not violate the Indiana Home Improvement Contract Act[1] (HICA), that the mechanic's lien was invalid because it contained mathematical errors when filed, and that the trial court erroneously awarded prejudgment interest to the Hayeses on the lien. Finding no error, we affirm.

## FACTS

Robert and John are friends and co-workers. For many years, Robert has had a part-time business doing construction work. In early 2001, John told Robert that he was interested in remodeling his farmhouse, parts of which were 150 years old. John used a software program to create some plans that, although they were not architectural plans and did not include dimensions, indicated approximately what John wanted to do to the residence. Robert examined the plans and stated that as a general matter, he thought he could perform the work, though he would have to check the feasibility of certain details. Robert and John agreed verbally that Robert would perform the work, with billing to be based on time and materials. There was no written contract, no bid, and no fixed contract price. Robert told John that no firm estimate was possible at the outset, though John remembers Robert stating that he thought he could complete the work for approximately $70,000. Robert and John did not discuss a start date or an end date for the project.

Robert and his crew were responsible for the carpentry, excavation, plumbing, some landscape grading, and some con-

crete work. John hired the trencher, the electrician, the heating and air contractor, the landscapers, the painters, the fireplace contractor, the gutter supplier, the tile supplier, the carpet installer, the concrete contractor, and the drywall supplier and finisher.

Groundbreaking on the foundation began in August 2001 and water lines were installed at the end of 2001. Robert began his work on the foundation in February 2002, beginning major work on the basement in April or May 2002. He began erecting rafters and beams in August 2002 and framed the sub-floor in October 2002. Demolition of portions of the old house and interior work began in November and December 2002. During construction, John made a number of changes and additions to his original plans, including a larger patio and deck, a finished basement, a poplar—rather than drywall—ceiling in the great room, two lofts, a master bath, an upstairs deck, and a wraparound covered front porch. John admitted that these changes substantially increased the cost of the project. The changes also added to the length of time required to complete construction. John testified at trial that the delay in completion of the remodeling did not hurt him financially. Tr. p. 45.

John testified that in the fall of 2002, he expressed some concern to Robert about when the job would be finished, and in the winter of 2002, John asked Robert for a timeline. Robert replied that he might be able to finish the work by May 2003, but the changes and additions to the original plans altered Robert's estimated timeline. As John's October 2003 wedding date approached, he frequently expressed concerns to Robert about the timeline, inas-

---

1. Ind.Code § 24–5–11–1 *et seq.*

much as he had planned to be married at the residence.

Robert billed John at irregular intervals. John paid the bills promptly until March 2003, when Robert gave John a bill for $16,668. Hayes did not object to the amount of the bill but told Robert that he was having some "money issues" and asked for more time to pay. Tr. p. 40, 41. Robert agreed and continued with the construction.

On June 13, 2003, John took several friends, including Robert, on a four-day "bachelor trip" to the Bahamas before his wedding. Appellee's Br. p. 6. John paid for Robert's airplane ticket with the understanding that Robert would later reimburse him. Although Robert asked John several times what the ticket had cost, John never provided that information. Robert and John never agreed that Robert would deduct the cost of the ticket from a construction bill.

John did not pay Robert at all during the spring and summer of 2003. On September 1, 2003, John paid $10,000, which was less than the amount he owed at that time. It was the last payment John made to Robert on the project. On October 2, 2003, John fired Robert. John never provided Robert with written notice of any construction defects or damages he suffered as a result of any defects, nor did he ask Robert to finish the project or correct any alleged problems.

Robert eventually asked John why he had not paid the remaining balance, John directed Robert to submit an itemized bill, and on November 9, 2003, Robert did so. The bill reported an unpaid balance of $13,983. At the bottom of the bill, Robert wrote, "John, I have not deducted airline tickets from bill." Appellant's App. p. 42. John questioned some of the charges on the bill, and on November 19, 2003, Robert filed a notice of intention to hold mechanic's lien.

On March 11, 2004, Robert filed a complaint against the Hayeses seeking to foreclose the mechanic's lien and requesting prejudgment interest and attorney fees.[2] On May 4, 2004, the Hayeses filed a counterclaim against Robert seeking damages for violation of HICA and breach of warranty. A bench trial on the complaint and counterclaim took place on April 30, May 1, and September 5, 2007. Subsequently, the parties filed proposed findings of fact and conclusions of law, and the trial court issued an order in favor of Robert on December 14, 2007, finding in pertinent part as follows:

18) [John] failed to pay the June 1, 2003 bill promptly because he did not have money available....

* * *

22) [John] did not object to any bill he received from [Robert] until October 3, 2003, when [John] objected to the amount of the bill that [Robert] told [John] he planned to submit.

23) [John] has not paid anything to [Robert] on [Robert]'s final bill of $13,983. [John] has disputed some of the labor charges o[n] that bill.

* * *

28) [Robert] and or his employees performed all of the work on [John's] house that [Robert] billed [John] for, with the exception of a charge for eight hours of [Robert]'s time on July 28, 2003.

2. Robert also named Old National Bancorp as a defendant, but the parties stipulated to the priority of the bank's mortgage lien and further stipulated that Old National need not appear or present evidence. Appellant's Br. p. 1. It did not take part in the trial and is not participating in this appeal.

29) [Robert]'s bill should be reduced by $200 to account for the error on July 28, 2003.

30) [Robert] paid for the materials that he charged [John] for, and the materials were used on [John's] house.

\* \* \*

34) [Robert] has incurred attorney fees and charges to foreclose his mechanic's lien in the amount of $12,130.

35) Interest on the sum of ... $13,783 at 8% from November 9, 2003 through December 14, 2007 is $1,208.34.

\* \* \*

39) [John] stated at trial that [the Hayeses] did not suffer monetary loss due to the duration of the project.

40) [John] did not complain about the quality of the work that [Robert] performed on the house until after [Robert] left the project. Since the time that [Robert] left the project, October, 2003, [John] has identified defects that he claims are the result of [Robert]'s poor workmanship.

\* \* \*

51) [John] did not at any time send to [Robert] any written list of defects.

\* \* \*

53) [John] did not permit [Robert] to return to [John's] property to finish any work or to make any repair or corrections to work.

\* \* \*

64) [John] paid for [Robert's] ticket to [the Bahamas]. [Robert] was to reimburse [John] for the ticket. [John] never told [Robert] how much the ticket was, although [Robert] asked several times. The final bill that [Robert] sent to [John] states that [Robert] did not deduct the price of the ticket from [Robert's] bill.

## Conclusions

\* \* \*

69) [Robert] failed to comply with [HICA] by failing to provide a written contract containing the elements prescribed by the statute.

70) [Robert's] failure to comply with [HICA] is defined by Indiana law a deceptive act, even though there was no evidence that [Robert] was aware of the law that requires home improvement contracts to be in writing, and even though [Robert] did not deceive [John].

71) [Robert's] failure to comply with [HICA] was not intentional or willful.

72) [The Hayeses] have not been damaged by [Robert's] failure to comply with [HICA].

73) The parties had no agreement about how long the project was to take. [John] knew that [Robert] worked part time, and [John] knew that [Robert] had other projects that he would be working on during [John's] remodeling.

74) The extensive changes to the plans during the project required additional time and money to complete the project.

75) [Robert] fulfilled many of the duties of a general contractor, but [Robert] did not assume a duty to complete the project by any particular date, or for a specific price.

76) [The Hayeses] did not suffer monetary loss or other compensable damage due to the duration of the project.

\* \* \*

78) ... [Robert's] errors in recording and reporting the time he and his em-

ployees worked on [John's] house were minor and were not intentional.

\* \* \*

88) [Robert] should have been allowed an opportunity to return to the work site to modify or repair any work that could be considered defective or deficient.

89) [John's] refusal to allow [Robert] to the work site to modify or repair any work that could be considered defective or deficient relieves [Robert] of responsibility he might otherwise have for defective or deficient work.

90) [Robert] should not be ordered to pay the [Hayeses'] attorney fees.

91) The issue of [Robert's] debt to [John] for [Robert's] airplane ticket to [the Bahamas] has not been raised by the pleadings in this case or tried by agreement, and is not decided by the court.

92) [Robert's] mechanic's lien in the sum of $13,783 should be foreclosed.

93) [Robert] is entitled to interest on the unpaid balance of [Robert's] claim of $13,783 at 8% from November 9, 2003 through December 14, 2007 in the amount of $1,208.34.

94) [Robert] is entitled to recover reasonable attorney fees of $12,130.

Appellant's App. p. 8–15. The Hayeses now appeal.

### DISCUSSION AND DECISION

#### I. *Standard of Review*

When, as here, a trial court has entered an order containing findings of fact and conclusions of law, we review the sufficiency of the evidence using a two-step process. *Huber v. Sering,* 867 N.E.2d 698, 706 (Ind.Ct.App.2007), *trans. denied.* First, we must determine whether the evidence supports the findings of fact, and second, we must determine whether those findings of fact support the trial court's conclusions of law. *Id.* We will set aside the findings only if they are clearly erroneous, which occurs when the record contains no facts to support them, either directly or by inference. *Id.* Moreover, a judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.*

In applying this standard, we neither reweigh the evidence nor assess witness credibility. *Id.* Rather, we consider the evidence that supports the judgment and the reasonable inferences that may be drawn therefrom. *Id.* To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.* As always, we apply a de novo standard of review to questions of law. *Lukis v. Ray,* 888 N.E.2d 325, 330 (Ind.Ct.App.2008).

#### II. *HICA*

The Hayeses first argue that the trial court erroneously concluded that they are not entitled to relief under HICA. The purpose of HICA

> is to protect consumers by placing specific minimum requirements on the contents of home improvement contracts ... [because] few consumers are knowledgeable about the home improvement industry or of the techniques that must be employed to produce a sound structure. The consumer's reliance on the contractor coupled with the well-known abuses found in the home improvement industry, served as an impetus for the passage of [HICA], and contractors are therefore held to a strict standard.

*Benge v. Miller,* 855 N.E.2d 716, 720 (Ind. Ct.App.2006) (internal citation omitted). To that end, HICA requires home im-

provement suppliers [3] performing any alteration, repair, or modification to a residential home property in an amount greater than $150 to provide the customer with a written home improvement contract. I.C. § 24–5–11–1 *et seq.* A home improvement supplier who violates HICA—by, among other things, failing to provide a written contract—commits "a deceptive act that is actionable ... by a consumer under IC 24–5–0.5–4 and is subject to the remedies and penalties under IC 24–5–0.5." I.C. § 24–5–11–14.

Indiana Code section 24–5–0.5–4 provides that "[a] person relying on an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." An "uncured deceptive act" means a deceptive act of which the consumer gave proper notice to the supplier and either the supplier made no offer to cure within thirty days of the notice or the act was not cured within a reasonable time. I.C. § 24–5–0.5–2(a)(7). An "incurable deceptive act" means "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." I.C. § 24–5–0.5–2(a)(8). The section related to limitation of actions explicitly states that

(a) No action may be brought under this chapter ... unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier [within a certain time frame], which notice shall fully state the nature of the alleged deceptive act and the

actual damage suffered therefrom, and unless such deceptive act shall have become an uncured deceptive act.

(b) No action may be brought under this chapter except as expressly authorized in section 4(a), 4(b),[ [4] ] or 4(c)[ [5] ] of this chapter. Any action brought under this chapter may not be brought more than two (2) years after the occurrence of the deceptive act.

I.C. § 24–5–0.5–5.

HICA explicitly provides that a supplier's failure to provide a written contract is a deceptive act and brings that deceptive act under the purview of the remedies and penalties of Indiana Code chapter 24–5–0.5. I.C. § 24–5–11–14. But to establish entitlement to those remedies, the consumer must show that the deceptive act was either uncured—meaning that notice was given and the deceptive act was not cured—or incurable—meaning that the supplier acted with an intent to defraud or mislead the consumer. I.C. § 24–5–0.5–4(a).

Here, it is undisputed that the Hayeses did not notify Robert of his deceptive act—the failure to provide them with a written home improvement contract containing information such as the approximate start and stop dates of the construction and the contract price—or afford him with an opportunity to cure the act. Thus, we cannot conclude that Robert's failure to provide a written contract was an uncured deceptive act. Furthermore, the trial court found that Robert's "failure to comply with

---

**3.** There is no dispute that Robert is a "home improvement supplier" as defined by the statute.

**4.** Section 4(b) entitles consumers to bring a class action against suppliers under certain circumstances. I.C. § 24–5–0.5–4(b).

**5.** Section 4(c) entitles the attorney general to bring an action to enjoin a deceptive act. I.C. § 24–5–0.5–4(c).

[HICA] was not intentional or willful." Appellant's App. p. 14. Indeed, nothing in the record suggests that Robert's actions were "part of a scheme, artifice, or device with intent to defraud or mislead." I.C. § 24–5–0.5–2(a)(8). Thus, we cannot conclude that Robert's failure to provide a written contract was an incurable deceptive act.

■ Finally, we note that even if Robert's action qualified as an uncured or incurable deceptive act, Indiana Code section 24–5–0.5–5(b) explicitly states that "[a]ny action brought under this chapter may not be brought more than two (2) years after the occurrence of the deceptive act." Here, the parties reached their verbal agreement in early 2001 and the Hayeses did not file their counterclaim raising Robert's failure to provide a written contract at that time until May 2004, three years later. In any event, therefore, their claim is time-barred. Under these circumstances, we can only conclude that the Hayeses are not entitled to the remedies included within the purview of HICA and the trial court properly denied their counterclaim against Robert.[6]

### III. Foreclosure of the Mechanic's Lien

■ The Hayeses next argue that the trial court erroneously ruled in Robert's favor by foreclosing his mechanic's lien. They base this argument on the facts that when Robert filed his notice of intent to hold the lien, the amount of the lien was misstated and that the trial court reduced the amount of his requested lien by $200

based on an error contained in one of his time sheets.[7] It is evident, however, that the error was inadvertent and easily cured, and we see no support for the Hayeses' argument that Robert made a false statement under oath by including an incorrect amount in the initial lien application and failing to modify the lien at a later date. Additionally, although the Hayeses argue that Robert should have deducted the amount of the airplane ticket to the Bahamas from his bill, the trial court properly concluded that the pleadings did not raise this specific debt, that the issue was not tried by agreement, and that it was not in any way related to the mechanic's lien. Thus, we find that the trial court properly entered a judgment of foreclosure on Robert's mechanic's lien.

■ Finally, the Hayeses argue that the trial court erred by awarding prejudgment interest on the lien, again relying on the computation error described above as support for their assertion that "the amount [owed] was not a sum certain when it was first advanced, and subsequently became even less so during the course of the trial . . . ." Appellant's Br. p. 13. They neither cite to authority in support of nor elaborate upon this argument. We note briefly that prejudgment interest may be awarded where the amount of damages can be ascertained by simple mathematical computation and has been allowed even where some degree of judgment must be used to measure damages. *Cincinnati Ins. Co. v. BACT Holdings, Inc.*, 723 N.E.2d 436, 441 (Ind.Ct.App.2000). Once it appears that the damages may be ascer-

---

**6.** Inasmuch as we find that the Hayeses are not entitled to damages under HICA, we need not consider their argument that the trial court erred by concluding that they sustained no actual damages as a result of Robert's actions.

**7.** To the extent that Robert contends that the trial court deducted too much from the

amount of the lien based on the computation error, we observe that he has not appealed the amount of the judgment. Additionally, we note that the most appropriate way in which to raise this argument would have been via a motion to correct error with the trial court. We decline to adjust the amount of the judgment on this basis.

tained with reasonable precision, an award of prejudgment interest is mandatory. *Wash. County Mem'l Hosp. v. Hattabaugh,* 717 N.E.2d 929, 933–34 (Ind.Ct. App.1999). Here, although Robert made an inadvertent error in computing the overall amount owed to him, his overall damages are ascertainable with reasonable precision based on the time spent by Robert and his employees and the materials purchased for the remodeling of the Hayeses' home. The trial court, therefore, properly awarded prejudgment interest to Robert.

Robert has filed a motion for appellate attorney fees based on Indiana Code section 32–28–3–14(a), which provides that "in an action to enforce a lien under this chapter, a plaintiff or lienholder who recovers a judgment in any sum is entitled to recover reasonable attorney's fees." Where a statute authorizes reasonable attorney fees, such fees include appellate attorney fees. *St. Vincent Hosp. and Health Care Center, Inc. v. Steele,* 766 N.E.2d 699, 705–06 (Ind.2002). Although it appears that Robert is entitled to appellate attorney fees in this matter, the proper way in which to raise the issue is by filing proceedings supplemental with the trial court. Thus, we deny his motion—though our denial does *not* imply that he is not entitled to this relief—and direct him to bring this request directly to the trial court.

The judgment of the trial court is affirmed.

CRONE, J., concurs.

KIRSCH, J., concur and dissent with opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

I concur with the decision of my colleagues to affirm the decision of the trial court on the plaintiff's complaint, but I respectfully dissent from their decision affirming the trial court's order denying relief on the defendants' counterclaim.

I do not believe that a breach of the Home Improvement Contract Act (HICA) is subject to the provisions of IC 24–5–0.5–2(a)(8) and must be either uncured or incurable. The relevant section in HICA (IC 24–5–11–14) says that failing to provide a written contract is a deceptive act that is actionable under IC 24–5–0.5–4 and "is subject to the penalties under IC 24–5–0.5." No mention is made of cure on incurability.

I believe that imposing the cure provisions undermines HICA's purposes and its requirement of written contract for home improvement projects. A home improvement contractor could escape liability (as here) by simply proceeding without a written contract unless the homeowners give notice at which time the contractor could cure the deceptive act by tendering a written contract.